**GOLDSTEIN, HORNER & HORNER, ATTORNEYS**
H. LEE HORNER JR. AZ. S.B. # 022791
PO Box 41196
Sacramento, CA  95841
916-344-3933
FAX 916-344-1096
e-mail:  **steinwayCA@yahoo.CA**

**M. Lynn Billings Esq.**
826 Pueblo Solano N.W.
Albuquerque, NM  87107

Attorneys for David Williams, M.D.
    Unsecured Creditor

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA
### PHOENIX DIVISION

| | |
|---|---|
| In Re: | Case No. 00-06189-ECF-RTB |
| WHITE MOUNTAIN COMMUNITIES HOSPITAL, INC.   DEBTOR | Chapter 11 Proceedings |
|   Tax ID # 86-0171900 | ***AMENDED* APPLICATION BY DE FACTO CREDITORS' COMMITTEE COUNSEL FOR ATTORNEYS FEES AND COSTS FOR HAVING MADE A SUBSTANTIAL CONTRIBUTION TO THE CASE** |

**H. Lee Horner Jr. And M. Lynn Billings, Attorneys** for unsecured

claimant David Williams, M.D. hereby file their Amended Application for

Approval of Payment of Attorneys' Fees and Costs to them for having made

a substantial contribution to this bankruptcy estate by virtue of having acted

1

throughout these proceedings as the ***de facto*** unsecured creditors' committee pursuant to ***11 U.S.C. 503(b)(3)(d), and (4).***

Applicants have acted on behalf of Dr. Williams, an unsecured claimant, but also as the de facto counsel for the unsecured creditors committee, in this instance a "one man" volunteer committee.

The U. S. Trustee appointed an official committee early on in the case (see docket no. 10) which was done after the largest scheduled unsecured creditors were solicited for membership.

Dr. Williams was not scheduled.

Among the committee members agreeing to serve is one John McDermott Esq. Of McDermott, Traynor, a California law firm not licensed in Arizona, that was paid substantial fees post-petition without court approval.

The official committee has remained silent throughout all of the bankruptcy proceedings. As will be shown, applicants have made a substantial contribution to the case.

**THE COURT PREVIOUSLY DENIED THIS MOTION WITHOUT PREJUDICE TO APPLICANT AMENDING TO FURTHER ESTABLISH A SUBSTANTIAL CONTRIBUTION HAVING BEEN MADE AND A CALCULATED APPORTIONMENT OF EXPENSES**

At the noticed hearing on the prior version of this application, the court determined that applicants' per se apportionment of 30% of all costs sought to his personal claim dispute with the debtor and 70% to confirmation issues was not sufficiently detailed for the instant motion.

While the debtor had previously made the judicial admission (in objecting to applicants' claim) that 70% of the attorneys fees, deposition expenses and associated costs were not related to the claim dispute per se (and thus related inferentially to matters of good faith, feasability, confirmation, etc), the court denied applicants' claim for attorneys fees and costs, without prejudice to their renewing the motion with a calculated

1     apportionment of the fees and costs and improved hook-up with substantial

2     benefit conferred[1].

3         Applicant's counsel have made a diligent review of all depositions

4     taken, all research undertaken in this case and have made a good faith

---

[1] Applicants also submit that in uncovering fraudulent acts that the debtor chose to ignore also are within the definition of substantial contribution; for example, over $30,000 of post-petition funds being given to Eric Baca, husband of CEO Wanger's girlfriend, Kara Baca, without court approval and the debtor declining to hire a collection agency to collect this gift back; the McDermott firm being allowed to keep most of the post-petition funds siphoned off without prior court approval rather than being subject to a disgorgement order. Giving the debtor this information is the substantial contribution; if the debtor chooses to "look the other way" the services should still be compensable; otherwise why should any unsecured creditor or committee even attempt to root out fraud?

percentage apportionment of the services rendered in the following categories:

      a.  Claim dispute only

      b.  Feasability of various plans being proposed & good faith issues;

      c.  Other Good faith issues;

      d.  Adequacy of various disclosure statements proposed;

      e.  Compliance with the Bankruptcy Code

As will be shown post, because of the efforts of applicant, this debtor went from a total freeze out/sell out of the unsecured claimants to a plan proposing a 100% dividend to the unsecureds over four years.

The record is clear, owing to the total absence of input from the official committee of unsecured creditors (which included the law firm of McDermott & Traynor, not licensed in Arizona and not approved at the time for employment by this court, that was siphoning off substantial non-court-approved fees post-petition), and the total apathy on the part of all other unsecured claimants in this case as to confirmation, had Dr. Williams not made the objections he did, when he did, and expended substantial resources of time and money, these unsecured claimants would have been sold down the river with the original 0% plan.

Thus, getting the debtor, kicking and screaming[2], to propose a 100% plan was for no reason other than applicant's continuing objections to any other treatment of the unsecureds.

**APPLICANTS UNCOVERED UNDISCLOSED ASSETS LEADING TO WITHDRAWAL OF SECOND PLAN OF REORGANIZATION**

The record shows a history of the debtor playing "hide the ball" from the court and, when caught, there is always an excuse.

Early on in the case, the debtor was bragging to the local Springerville press about how it would emerge from bankruptcy totally free of the pre-petition unsecured debt and would sell the hospital as a package, including the Villa Escudilla apartment complex, to a third party buyer.

The debtor, however, did not schedule the Villa Escudilla. Applicants investigated and learned that the debtor is the 100% owner of the non-profit WMCH Development Corporation which itself owns the Villa Escudilla.

Applicants also determined that the WMCH Development Corporation board *had the same membership as the debtor hospital!*

---

[2] Included in the "kicking and screaming" definition would be the vicious personal and professional attack lodged by the debtor against Dr. Williams, first as a pre-petition whistle-blower as to various frauds perpetrated by former CEO Wanger and, post-petition as to the debtor's refusal to provide documents in discovery, opposition to appointment of an examiner, hiding records from the Health Care District-funded "audit" among other things.

When this discrepancy was brought to the court's attention around the time a second plan of reorganization was being proposed, the debtor's counsel, Mr. McGrath agreed with the court that this asset should be scheduled.

The schedules were finally amended showing the debtor to have an equitable ownership interest in WMCH Development with an "unknown" value.

Thereafter, the debtor proposed the second amended plan of reorganization which did not assign a value of more than $25,000 to this ownership interest, completely without explanation as to how that amount was valid as of the date of the proposed plan.

There was no expert testimony from the debtor as to valuation nor as to saleability of the corporation and/or the corporate asset.

The debtor, thus, did not present a true and accurate liquidation analysis in its disclosure statement which was withdrawn after Dr. Williams raised these issues.

The court ultimately, around the time of the final confirmation hearing, determined that this was an asset with no value as it was held by a

1   non-profit corporation that could not be liquidated for the benefit of this

2   debtor.

3   The court declined to direct the sale of the corporation itself, however,

4   rather than a liquidation of its assets, notwithstanding testimony from an

5   expert in bankruptcy liquidations testifying that in his experience, there was

6   a 60% chance the corporation, as a package, could be sold to enterprises that

7   buy such entities.[3]

8   The debtor was well aware that if it didn't propose a 100% plan, that

9   the court's ruling on the apartment complex subsidiary corporation would be

10  looked at with scrutiny by an appellate forum; thus Dr. Williams'

11  uncovering of this hidden asset and bringing it to the court's attention, by

12  inference, played a part in the debtor's ultimate proposing of a 100% plan.

**APPLICANTS SUCCESSFULLY CHALLENGED THE
DEBTOR'S LIQUIDATION ANALYSIS IN THE SECOND PLAN
AND MOVED FOR APPOINTMENT OF AN EXAMINER**

17  In addition to challenging the debtor's a defective liquidation analysis

18  (to which no one objected except Dr. Williams), applicants also moved for

---

[3] The record also shows that the HUD loan securing the apartment complex owned by the subsidiary WMCH Devleopment Inc. would be paid in full in another 15 years, although subsidized rents would continue to flow in. It appears there are entities that acquire such non-profit operations that will pay money, today, for the right to receive encumbrance free rents down the road.

appointment of an examiner to report to the court what became of the payroll taxes and employee insurance contributions deducted from paychecks but not forwarded to the tax and insurance entities, and to investigate why the intensive care unit, which then CEO Wanger convinced the court and the health care district was necessary, had never opened.

The record shows that at about this same time Wanger was paying estate funds to the McDermott Traynor law firm which had not been authorized to be employed by this court, and of course, which had not presented fee applications.

The Court denied the examiner motion of Dr. Williams, instead authorizing a most limited audit of the debtor's recent activities, funded by the Health Care District (which also opposed an examiner).

The record shows that the first auditors (Miller, Wagner) were told various records did not exist or were otherwise denied access to the true records, thus making ineffective their "audit" of operations.

However, when the debtor found it advantageous to have an audit from petition day-one forward (as Dr. Williams had suggested in his examiner motion), this second accounting firm, as if by magic, had access to

1     all the books and records of the debtor and reported of all the financial

2     misconduct and defalcation going on post-petition.

3     Now of course it is obvious why the debtor was vehement in its

4     objection to the examiner appointment----substantial misdeeds would have

5     been brought to light and acted on by the court.

6     It was Dr. Williams who first pointed out these misdeeds and

7     continually demanded answers. This is also a substantial contribution to this

8     case.

9     **OBJECTION TO THIRD AMENDED PLAN SUSTAINED**

10     The debtor has gone from proposing a reorganization plan involving

11     sale of the hospital (wherein it never specified how the sale would be

12     effected), to a stand-alone plan where the unsecured claimants were not

13     promised hardly anything, to the present plan, confirmed by the court, where

14     the unsecured claimants are projected to receive a 100% dividend over four

15     years.

16     Dr. Williams objected to the debtor letting the McDermott firm off the

17     hook for the improperly paid estate funds and filed his objection to

18     McDermott's claim as well as to its nunc pro tunc employment application

19     and ex post facto ratification of fees paid.

Not until Dr. Williams objected to this claim did the debtor also object.

As a proximate result of Dr. Williams' actions, McDermott, finally, ***unconditionally withdrew*** its claim for $38,381.85 although the withdrawal of this claim had previously been conditioned upon approval of the nunc pro tunc employment application.

The debtor had four years to object to this claim and never did until Dr. Williams did so.

Although the debtor has been convinced by McDermott that because it won't voluntarily return this ill gotten gain litigation will be necessary and the debtor better settle to avoid such litigation, Dr. Williams has opposed the settlement (which reduces funds available to the unsecureds) on the grounds that all that is required is an order of the court for disgorgement and a visit by the U. S. Marshal's office to McDermott's bank with a copy of the order for things to be made right.

No litigation, no expense of consequence, just an easy recovery of embezzled funds.

The court has now ruled on this matter, approving the debtor's suggestion that the matter be compromised for pennies on the dollar, and this final order has been appealed by Dr. Williams.

***The debtor is not a party to the appeal but is a third party beneficiary***.

It is uncertain at this point whether the BAP will agree that the compromise of a substantial disgorgement claim, that was fully briefed and ready for decision by the bankruptcy court, was appropriate under the circumstances of this case, including whether the Ninth Circuit's policy on nunc pro tunc employment orders was followed.

Once again, it was Dr. Williams looking out for the unsecureds interests when the debtor wouldn't.

As to the Eric Baca give-away, the court ordered the debtor to determine the feasability of recovery of these funds as a condition of confirmation. Bringing this issue to light even though the debtor chose to not pursue the asset (nor sell it, nor consign it to a contingency-fee collection agency) was nonetheless a substantial contribution to this estate.

## BECAUSE OF APPLICANTS' EFFORTS, THE UNSECURED CLAIMANTS ARE NOT PROJECTED TO RECEIVE A 100% DIVIDEND COMPARED TO 0% WHEN THE CASE COMMENCED

Applicants have doggedly insisted on the debtor's compliance with applicable bankruptcy code provisions, they have uncovered improper business dealings, and sent the debtor back to the drawing boards several times with respect to proposing a fair and equitable plan.

Originally the unsecureds were not promised anything.

Since Dr. Williams has been the only serious objector to the various plans, the court may well conclude that the debtor decided to "see the light" and propose a realistic reorganization plan to prevent any further opposition by applicants.

Indeed a 100% plan has now been confirmed[4] and debtor's management has assured the court, under oath upon Dr. Williams' counsel's inquiry, that its projections for repayment are workable.

---

[4] Dr. Williams did object to this now-confirmed plan as well and there was a one day confirmation hearing/trial. The substantial benefit flowing from this trial was the debtor's sworn testimony that the hospital ***will not be sold post-confirmation*** notwithstanding reports that the hospital's financial advisor has secret buyers waiting in the wings; sale of the debtor post-petition would likely make it impossible to pay the unsecureds anything as there would be no post-confirmation revenues.

**APPORTIONMENT OF APPLICANTS' FEES AND COSTS**

The costs and fees are specifically set forth in attachments hereto which are incorporated by reference at this point. A summary of the costs and fees sought is as follows:

LYNN BILLINGS SERVICES RE: DEPOSITIONS, INCLUDING DEPOSITION EXPENSES TOTAL $28,774.37, APPORTIONED TO MATTERS OTHER THAN CLAIM LITIGATION THUS:

UHL DEPO:  $347.85

    10% claim related
    50% feasability related    = $ 173.93
    40% confirmation related    = $ 139.14 = $ $313.07

Marnie Uhl confirmed the hospital board's decision of May 15, 2002 not to sell the hospital at a time when a "sell out" plan was in play thus the board had not authorized the liquidation plan Wanger had told debtor's counsel to propose; late in discovery it was accidently discovered that the fact of sale of the hospital had been discussed at the October 17, 2002 board meeting with Ann Coleman Hall who stated the Villa Escudilla apartments were not involved. These minutes were not produced in discovery and were instead discovered at the Doug Brown deposition.

JAMES KIMBALL DEPO:   100% feasability related; president of hospital board; 0% devoted to claim    $ 379.44

Margaret Brown Deposition: $1,408.05

    18% Claim related
    82% confirmation and feasability related
    =   $ 1154.60

Dr. Brown testifed as to fraudulent executive committee minutes being kept by Kara Baca; to being misquoted; testimony went to the good faith of the plans advanced and ability of the debtor to successfully reorganize; she also testified as to the plan underway to discredit Dr Williams by repeatedly destroying his credentialling packages when she was shown such a package by Dr. Memon which was supposedly never presented to Kara Baca, the board's designee to receive same. Goes to credibility of the documentation supporting confirmation.

DENISE THURMAN DEPOSITION:   $377.40

    10% claim related
    90% good faith, feasability confirmation issues $ 339.66

Confirmed the bad faith acts of the hospital executive staff; she was fired as a result of discrediting Kara Baca among other reasons.

CHRISTINE JACKSON, M.D. DEPO:   $ 1095.30

Claim related: 28%
Feasability and good faith of plans and ability of management to successfully reorganize:   72% = $ 788.62

Dr. Jackson testified that Wanger bragged about how inept the board was with accounting matters; that none of them knew how to "balance the books" and that he could get the board to do anything he wanted. These were issues raised by Dr. Williams early on in this case, particularly with the examiner motion.

Feasability due to substandard medical care in ER post petition, and substantial likelihood that ICU would not ever open as such.

KARA BACA DEPO:   $4,920.74

    Claim related:  25%
    Good faith of plans advanced: 75% = $ 3690.55

Kara Baca, the girlfriend of the now-fired CEO Wanger, had by the time of her depo been determined to have repeatedly falsified hospital board minutes, was a no-show twice for her deposition, and ultimately had no explanations for the deficient record keeping, inaccurate board minutes, misquoting of executive staff at meetings and deliberately losing Dr. Williams' credentialling packages when it was obvious that he was blowing the whistle on numerous improper activities and needed to be "silenced" and discredited.

ANN COLEMAN HALL–ACTING C.E.O. AFTER WANGER'S DEPARTURE

Claim related: 0%
Confirmation related as to issues of feasability: 100% $ 3,277.70

Mrs. Hall had no first hand knowledge about Dr. Williams' departure and denied having any knowledge of his abilities. She testified to the deficiencies in hospital operations, action against the hospital's license by the Board of Medical Examiners including the refusal to certify the hospital as able to open the long-completed ICU.

APRIL MARLOW DEPOSITION: $1,336.36

   10% claim related
   90% confirmation, feasability and good faith $ 1202.72

Witness, who was in charge of the ER, was refused financial and budget information on the ER operations; she did learn that significant non-ER costs were being shifted to the ER by hospital management, and resigned over this issue.

CARRIE ADAMSON, M.D. Claim: 0%
Feasability on confirmation 100% $   533.61

Witness testified as to intimidation of hospital employees and contractors that wouldn't "play ball" and participate in deceitful conduct. Goes to the issues raised by Dr. Williams as to improper management and need for examiner or forensic examination of hospital's books.

T. ADAMSON, M.D.  Claim: 25%
      Good faith of plans presented & confirmation : 75%  $402.46

Witness participated in the "peer review" of Dr. Williams and was the heart of the coverup of same; he testified that no peer review had taken place; attorney Petersen at the deposition stated point blank there were no peer review minutes in existence (which turned out to be false when Doug Brown produced them at his deposition, long after this deponent was examined).

Testimony was elicited establishing a pattern of misconduct by hospital staff as to financial and accounting matters beyond the claim objection issues.

ABDUL MEMON    $4469.15

      Claim: 35%
      Feasability, good faith 65% $ 2904.94

Former Chief of Staff; testified falsely about peer review/no peer review of Dr. Williams; falsely testified as to not having credentialling package when he in fact had it per testimony of Dr. Chris Jackson (he showed it to her); looked the other way when Health Horizons/Allied Health physicians assistants were illegally practicing medicine willy nilly.

DAVID ROSS–FORMER C.E.O
      Claim related: 0%
      Confirmation/good faith and feasability: 100% $ 1774.69

Testified how Health Horizons and Allied Health defrauded the hospital out of substantial ER patient revenues while management looked the other way; improper diversion of ER patients at the ER door, diverting them to the Health Horizons/Allied Health offices instead in violation of the law, a practice that continued during Dr. Williams' tenure and post petition.

Testimony goes to the good faith of the plans advanced and feasability.

SCOTT HAMBLIN   0% Claim
         100% Good faith, feasability and confirmation issues $ 1136.20

Witness testified why the newly constructed (post petition) ICU would never open up and the lack of confidence in the debtor hospital by BOMEX in not certifying the hospital to operate an ICU.

BEN TERRY       $1159.80

         Claim: 40%
         Confirmation: good faith: 60%   $ 695.88

Testified that he remembered peer review minutes being kept by Kara Baca when previously Dr. T. Adamson testified no such minutes existed, which was affirmed by debtor's counsel Fred Petersen.

Issue goes to truthfulness of debtor in presenting plans of reorganization.

DOUG BROWN    $ 1210.34

 CLAIM: 25%
    CONFIRMATION: 75% $ 907.76

This witness actually produced board minutes of a peer review meeting that
had previously been represented as never having taken place, and no minutes
being in existence.  Goes to good faith of the debtor and credibility of its
management and counsel in representing on the record that particular
records did not exist when Doug Brown produced them.  Established the
need to use heightened scrutiny of any plan proposed by this debtor.

RITU KHANA   Claim: 0%
    Confirmation (good faith, feasability): 100%  $ 1681.34

Hired to staff the ICU; left when it was apparent that the ICU would not
open.  Testified as to deficient patient care that continued post petition,
cover up of an ER patient's death post petition and deterioration in quality of
medical care during reorganization.  She provided testimony as to
deteriorating ER medical quality, retaliation by hospital management, the
hospital's systematic non-reporting of deficiencies required by law to be
reported to BOMEX not being reported and IRS withholdings not being
paid.

DAVID WANGER DEPOSITION:            $3666.65

        Claim: 5%
        Confirmation/good faith/feasability: 95%  $3483.32

The witness was totally discredited in this deposition which was necessary in
the event he was called as a witness in the confirmation case.  Testified as to
creative bookkeeping/accounting procedures; i.e. in the first 9 months of
2002 the hospital was operating "in the black" when in fact the OBGYN and
Surgery departments were closed in February of that year, during his tenure.

DUANE HUTCHINSON       claim: 0%
    Good Faith/feasability: 100% $ 4077.81

Testified to a continuing pattern of deliberate impoverishing the hospital which continued post petition.

FEES AND COSTS FOR H. LEE HORNER JR.

Apportioned on Exhibit L between claim and non-claim related services for each line item, incorporated by reference at this point.

TOTAL NON CLAIM HOURS SET FORTH:
143.215 x $225.00 per hour = $32,223.37

GRAND TOTAL SOUGHT BY THIS FEE APPLICATION:

**$ 60,997,74 \*\***

    For the reasons shown, applicants H. Lee Horner Jr. And M. Lynn Billings, hereby move this court for an order for an award of administrative attorneys fees and costs for having rendered a substantial benefit to the estate as shown, and for such other and further relief as the court deems appropriate.

    Respectfully submitted March 15, 2005,

    GOLDSTEIN, HORNER & HORNER

    **S/ H. LEE HORNER JR**